**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LARISSA WHIPPLE, individually and on behalf of all others similarly situated,<br><br>                                   Plaintiff,<br><br>       v.<br><br>JOHNSON & JOHNSON CONSUMER INC.<br><br>                                   Defendant. | Case No.:<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Larissa Whipple ("**Plaintiff**"), on behalf of herself and all others similarly situated, brings this class action against Defendant Johnson & Johnson Consumer Inc. (**"Johnson & Johnson"**) and alleges on personal knowledge, investigation of her counsel, and on information and belief as follows:

## INTRODUCTION

1.      This is a nationwide class action brought by Plaintiff on behalf of herself and other similarly situated consumers who purchased various OGX branded Shampoo and Conditioner Products (collectively, the "**Products**" or "**OGX Products**") for personal or household use and not for resale ("**Class**" or "**Class Members**").

2.      Plaintiff purchased the Products because of Johnson & Johnson's uniform false representation that the Products would smooth, nourish, soften, repair, and/or revive her hair. Undisclosed by Defendant to Plaintiff and Class Members and therefore unknown to Plaintiff and Class Members, the Products contain an ingredient or combination of ingredients that causes significant hair loss and/or scalp irritation upon proper application. At least one

ingredient in the Products, DMDM hydantoin, is a formaldehyde donor known to slowly leach formaldehyde when coming into contact with water.

3.     Formaldehyde is a well-known human carcinogen that can cause cancer and other harmful reactions when absorbed into skin. DMDM hydantoin has been used as a preservative in Johnson & Johnson products for well over a decade; however, the use of DMDM hydantoin as a preservative creates an entirely unnecessary risk because various safer natural alternatives exist. As such, the Products are rendered dangerous and unsafe for sale as over-the-counter hair smoothing shampoo products.

4.     Defendant failed to properly warn consumers of the risks and dangers attendant to the use of such a strong ingredient on their hair and scalp – even well after Defendant knew or should have known of the Products' hazards. Defendant continued to conceal the dangers of the Products by failing to appropriately and fully recall the Products, by continuing to claim the Products were safe when properly applied, and by failing to warn consumers of the dangers attendant to the Products' use.

5.     Defendant's uniform acts and omissions in connection with the development, marketing, sale and delivery of the Products violate Illinois' consumer protection laws, constitute common law fraud, and unjustly enrich Defendant.

6.     Johnson & Johnson labeled, advertised, promoted and sold the Products targeting both men and women who wanted smooth, shiny, soft, nourished, and healthy hair.

7.     The Products contain uniform misrepresentations in large bold font on the Products' front labels about nourishing, reviving, enhancing natural softness, and repairing damaged hair and leaving hair thicker, fully, and healthier.

8.     Through its labeling and an extensive marketing campaign, including through its

2

website and online advertisements, Johnson & Johnson made a number of affirmative misrepresentations: that the Products contain special formulas (e.g. "Argan Oil, Biotin and Collagen, Coconut Oil, Pomegranate") intended to nourish and revive damage or dry hair, add softness and shine, and prevent frizzing and tangling; and that the Products "deeply nourish," "gently cleanse," and "repair hair."

9.     However, the Products' formula contains an ingredient, or combination of ingredients, that has caused Plaintiff and thousands of consumers to experience hair loss and/or scalp irritation.

10.     DMDM hydantoin is found, *inter alia*, in the following Products as stated on the Products' back labels:

- Below is the ingredient list located on the back label of the OGX Biotin + Collagen Shampoo:



- Below is the ingredient list located on the back label of the OGX Biotin + Collagen Conditioner:



- Below is the ingredient list located on the back label of the OGX Renewing Argan Oil of Morocco Shampoo:



- Below is the ingredient list located on the back label of the OGX Renewing Argan Oil of Morocco Conditioner:



4

- Below is the ingredient list located on the back label of the OGX Anti-Breakage and Keratin Oil Shampoo:



- Below is the ingredient list located on the back label of the OGX Anti-Breakage and Keratin Oil Conditioner:



- Below is the ingredient list located on the back label of the OGX Detox + Pomegranate & Ginger Shampoo:



- Below is the ingredient list located on the back label of the OGX Detox + Pomegranate & Ginger Conditioner:



- Below is the ingredient list located on the back label of the OGX Marula Oil Conditioner:



- Below is the ingredient list located on the back label of the OGX Nicole Guerriero Midnight Kisses Shampoo:



- Below is the ingredient list located on the back label of the OGX Nicole Guerriero Midnight Kisses Conditioner:

6



- Below is the ingredient list located on the back label of the OGX Nicole Guerriero Mistletoe Wishes Shampoo:



- Below is the ingredient list located on the back label of the OGX Nicole Guerriero Mistletoe Wishes Conditioner:



- Below is the ingredient list located on the back label of the OGX Nicole Guerriero Ice Berry Queen Shampoo:



- Below is the ingredient list located on the back label of the OGX Nicole Guerriero Ice Berry Queen Conditioner:



- Below is the ingredient list located on the back label of the OGX Extra Strength Hydrate & Repair and Argan Oil of Morocco Shampoo:



8

- Below is the ingredient list located on the back label of the OGX Extra Strength Hydrate & Repair and Argan Oil of Morocco Conditioner:



- Below is the ingredient list located on the back label of the OGX Ever Straightening and Brazilian Keratin Therapy Shampoo:



- Below is the ingredient list located on the back label of the OGX Ever Straightening and Brazilian Keratin Therapy Conditioner:



- Below is the ingredient list located on the back label of the OGX Kandee

Johnson Candy Gumdrop Shampoo:



- Below is the ingredient list located on the back label of the OGX Kandee Johnson Candy Gumdrop Conditioner:



- Below is the ingredient list located on the back label of the OGX Kandee Johnson Frosted Sugar Cookie Shampoo:



- Below is the ingredient list located on the back label of the OGX Kandee Johnson Frosted Sugar Cookie Conditioner:



- Below is the ingredient list located on the back label of the OGX Kandee Johnson Sparkling Cider Shampoo:



- Below is the ingredient list located on the back label of the OGX Kandee Johnson Sparkling Cider Conditioner:



- Below is the ingredient list located on the back label of the OGX Quenching + Coconut Curls Shampoo:



- Below is the ingredient list located on the back label of the OGX Quenching + Coconut Curls Conditioner:



- Below is the ingredient list located on the back label of the OGX Hydrate + Defrizz and Kukui Oil Conditioner:



- Below is the ingredient list located on the back label of the OGX Youth Enhancing + Sake Essence Conditioner:



11.     In fact, for approximately a decade, Johnson & Johnson has known that DMDM hydantoin can cause or contribute to hair loss and scalp irritation when used as a preservative in hair products, including shampoo and conditioner products.  In August 2012, Johnson & Johnson announced plans to remove DMDM hydantoin, and other similar ingredients, from all consumer products by the end of 2015.[1]

12.     Upon information and belief, Johnson & Johnson did in fact remove DMDM hydantoin from existing consumer products at that time.  However, when Johnson & Johnson

---

[1] *See* NY Times Article, "*Johnson & Johnson to Remove Formaldehyde From Products*", dated August 15, 2012 found at https://www.nytimes.com/2012/08/16/business/johnson-johnson-to-remove-formaldehyde-from-products.html (last accessed on June 7, 2021).

acquired Vogue International, including their line of OGX products, Johnson & Johnson failed to change the ingredient profile of the products that did not maintain the same standards for consumer safety. Since 2016, Johnson & Johnson has continued to market, sell and profit off of the Products that contain ingredients knew could harm consumers.

13. Johnson & Johnson's own website about consumer safety says the following about preservatives used in consumer products:

> "Many preservatives do not meet our safety and care standards. Examples of preservatives that we will not use in any skin care product include bromochlorophen, formaldehyde, paraformaldehyde, formic acid, bronopol, dichlorobenzyl alcohol, triclocarban, p-chloro-m-cresol, triclosan, methenamine, ketoconazole, silver citrate, thimerosal, chloroacetamide, 5-bromo-5-nitro-1,3-dioxane, butylparaben, isobutylparaben, and benzylparaben. In addition, examples of preservatives that don't meet our standards for baby products also include methylparaben, ethylparaben, propylparaben, iodopropynyl butylcarbamate, quaternium-15, DMDM hydantoin, imidazolidinyl urea, and diazolidinyl urea."[2]

14. Despite having public knowledge since at least 2012 that DMDM hydantoin, as a formaldehyde donor, can cause or contribute to hair loss and scalp irritation, Johnson & Johnson has inexplicably continued to include this ingredient as a preservative in some of its OGX products **while simultaneously** (1) not using DMDM hydantoin as a preservative in many of its other OGX products, (2) not using DMDM hydantoin in other Johnson & Johnson brands of shampoo and conditioner, and (3) not using DMDM hydantoin in identical OGX products sold in other countries.

15. Upon information and belief, despite Johnson & Johnson's past acknowledgment that use of DMDM hydantoin was not good for consumers including babies, it has not made any attempt to reformulate the OGX Products containing DMDM hydantoin in the United States

---

[2] https://safetyandcarecommitment.com/ingredients/preservatives, (last accessed June 7, 2021).

since acquiring the brand in 2016. Defendant has, in fact, reformulated the OGX Products in other countries.

16. Although Johnson & Johnson was, or should have been, aware of the high potential for toxicity or allergic reaction caused by one or more of the ingredients in the OGX Products, it has failed and continues to fail to warn consumers about possible reactions, including hair loss and scalp irritation on any of the OGX Products' labeling.

17. Nowhere on the package labeling or on Johnson & Johnson's websites or other marketing materials did Johnson & Johnson warn Plaintiff and members of the Class that they were at risk of significant hair loss and/or scalp irritation upon proper application of the products. Accordingly, Johnson & Johnson misled and deceived the public, and placed its customers in harm's way, all for the sake of increased profits.

18. U.S. consumers reasonably expect that their hair care products will not cause significant hair loss and/or scalp irritation because of defective design and manufacturing or because of inadequate research of due diligence. In addition, U.S. consumers had no expectation that the OGX Products would or could cause scalp irritation and/or cause their hair to fall out.

19. Further, consumers reasonably expect that if Johnson & Johnson, the company primarily responsible for developing, manufacturing, marketing and distributing the OGX Products, knew that the OGX Products would or could cause irritation and/or hair loss (whether by proper application or by misapplication), Johnson & Johnson would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem. By downplaying, concealing and misrepresenting the Products and the safety and risks of their use, Johnson & Johnson failed in its duty to provide consumers with adequate information. Johnson & Johnson continued to create and perpetuate a false public

perception that there was little or no risk of harm from the use of its OGX Products even knowing of the Products' dangers and despite previously stating their commitment to removing such ingredients from their products. Moreover, Johnson & Johnson's efforts to conceal and downplay the hundreds if not thousands of complaints of Class Members who have lost their hair or endured scalp irritation, as a result of using the Products as intended, comprised a pointed attack on consumers.

20.     Defendant manufactures, advertises, markets, distributes, and sells the OGX Products throughout the United States, and in Illinois. As alleged with specificity herein, Defendant did so through an extensive, uniform, nationwide advertising and marketing campaign, specifically marketing the Products as shampoos and conditioners that make hair "fuller, smoother, straighter, curlier, or bouncier and smell irresistible."

21.     Johnson & Johnson labeled, advertised, promoted and sold the OGX Products targeting men and women who wanted to safely nourish, cleanse, and repair hair in order to obtain smooth, shiny, and healthy hair. Through an extensive marketing campaign and via its OGX website and packaging, Johnson & Johnson made a number of affirmative misrepresentations, including that the Products were formulated to safely nourish, cleanse, revive, and repair hair in order to obtain the desired results.

22.     However, Johnson & Johnson knew but failed to disclose to Plaintiff and the putative Class the danger of hair loss and/or scalp irritation caused by one or more ingredients in the Products, including the formaldehyde donor ingredient DMDM hydantoin.

23.     Defendant failed to properly warn consumers of the risks and dangers attendant to the use of such a strong preservative and human toxicants on their hair and scalp – even well after Defendant knew or should have known of its hazards. Defendant continued to conceal the

16

dangers of the Products by failing to recall the Products and failing to reformulate the Products like Defendant has in other countries.

24.     As a result of Defendant's misconduct and misrepresentations, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

25.     Plaintiff brings this suit to halt the unlawful sales and marketing of the Products by Defendant and for economic damages she sustained as a result. Given the massive quantities of the Products sold all over the country, this class action is the proper vehicle for addressing Defendant's misconduct and for attaining needed relief for those affected.

## PARTIES

26.     Plaintiff Larissa Whipple is and was at all times relevant to this matter a resident and citizen of the state of Illinois, residing in Davis, Illinois, which is in Winnebago County.

27.     Defendant Johnson & Johnson is a corporation organized, existing, and doing business under and virtue of the laws of the state of New Jersey, with its office and principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. At all times Johnson & Johnson manufactured, marketed, designed, promoted and/or distributed the Products nationwide, including in Illinois.

## JURISDICTION AND VENUE

28.     This Court has personal jurisdiction over Defendant in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. Defendant has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class

17

Members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time Defendant was engaged in business activities in the state of Illinois.

29.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

30.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District. Furthermore, Plaintiff is a citizen of Illinois, and she resides in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

**A.  Johnson & Johnson's Business.**

31.     In 1886, Johnson & Johnson was founded to develop medical devices, pharmaceuticals, and consumer products.

32.     Johnson & Johnson boasts that its corporation includes over 250 subsidiary companies with operations in 60 countries and worldwide sales over 70 billion dollars across 175 countries.

33.     Johnson & Johnson's brands include numerous well-known pharmaceutical,

medical device, and consumer product companies. In addition to OGX, Johnson & Johnson's consumer brands include Neutrogena, Aveeno, Listerine, Band-Aid, Tylenol, and Johnson's.

34.     In 2016, Johnson & Johnson acquired Vogue International for US $3.3 billion in cash. The acquisition included many large beauty products, including the OGX line of products. At the time of the announcement, Johnson & Johnson claimed that the "acquisition of Vogue International's full line of leading advanced hair care products sold in the U.S. and in 38 countries will strengthen our global presence in this important category. Vogue International's commitment to quality, innovation, and consumer preference complement our Consumer portfolio, while also presenting attractive hair care category growth opportunities for Johnson & Johnson."[3]

35.     Johnson & Johnson represents itself and its OGX brand to be a global "leader in the hair industry with its award-winning shampoos, conditioners and hair stylers" and "designed for consumers who want to make better choices about the products they use and lifestyle they live."[4]

36.     As part of its OGX brand, Johnson & Johnson sells the Products at issue here.

**B. DMDM Hydantoin and Johnson & Johnson's Broken Promise to Remove it from Personal Care Products.**

37.     There are numerous preservatives that are used in cosmetics and hair products, including formaldehyde donors; many of which have been linked to the development of

---

[3] *See* Press Release, "Johnson & Johnson Announces Agreement to Acquire Vogue International", dated June 2, 2016, found at https://www.prnewswire.com/news-releases/johnson--johnson-announces-agreement-to-acquire-vogue-international-300278443.html (last accessed on June 7, 2021).

[4] *See* Press Release, " OGX Beauty Launches New Global Campaign, Inspiring Everyone to Rock What You Got", dated April 10, 2017, found at https://www.prnewswire.com/news-releases/ogx-beauty-launches-new-global-campaign-inspiring-everyone-to-rock-what-you-got-300437544.html (last accessed June 7, 2021)

allergies, dermatitis, hair loss, and even cancer.

38.    Specifically, formaldehyde donors are preservatives that are "added to water-containing cosmetics (which includes personal care products/toiletries) to prevent the growth of micro-organisms that may enter during manufacture or during their usage."[5]

39.    Despite having intimate knowledge of the risks of using formaldehyde donor preservatives since at least 2012, Johnson & Johnson continues to use formaldehyde donors, DMDM hydantoin (also known as DMDM-h) and sodium hydroxyl, in its OGX products despite removing the preservative from nearly all other consumer products in 2015.

40.    "DMDM hydantoin (dimethylodimethyl hydantoin) is a formaldehyde donor used as a preservative in cosmetic products at concentrations up to 1%."[6] In other words, it is a formaldehyde-releasing preservative ("FRP") used to lengthen the shelf life of personal care products, including hair products.

41.    "An important source of human skin contact with formaldehyde is the use of cosmetics containing formaldehyde-releasers as preservatives."[7]

42.    In personal care products, such as shampoo, "formaldehyde can be added directly, or more often, it can be released from preservatives such as… DMDM hydantoin." Specifically, the formaldehyde donor will "release small amounts of formaldehyde over time."[8]

---

[5] de Groot AC, White IR, Flyvholm MA, Lensen G, Coenraads PJ. Formaldehyde-releasers in cosmetics: relationship to formaldehyde contact allergy. Part 1. Characterization, frequency and relevance of sensitization, and frequency of use in cosmetics. Contact Dermatitis. 2010 Jan;62(1):2-17. doi: 10.1111/j.1600-0536.2009.01615.x. PMID: 20136875.

[6] "Patch test reactivity to DMDM hydantin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (*Contact Dermatitis*, 1988, 18:197-201).

[7] De Groot AC, *supra* note 15.

[8] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed June 7, 2021).

43.     "In 1984, DMDM hydantoin ranked 9th in the list of the most frequently used cosmetic preservatives in the USA."[9]  By 1987, DMDM hydantoin (or "DMDMH" for short) was included in approximately 115 product formulas filed with the FDA, most frequently in shampoos.[10]

44.     "DMDMH was the 21st most common allergen in the 2005-2006 NACDG standard series. DMDMH is a preservative that contains 0.5% to 2% free formaldehyde and over 17% combined formaldehyde."[11]

45.     For many decades, since the 1970's, if not earlier, studies and patch tests were being performed to determine human reactivity to DMDM hydantoin,[12] including specifically the "relationship between contact allergy to formaldehyde," including "test reactions to DMDM hydantoin."[13]

46.     One study performed in 1987 specifically examined "whether the presence of DMDM hydantoin in cosmetics may cause adverse effects in patients pre-sensitized to formaldehyde."[14] The conclusion even more than twenty years ago was that "aqueous solutions of DMDM hydantoin, in concentrations comparable to those used in cosmetic products, contain enough free formaldehyde to cause dermatitis…," and that despite earlier conclusions that

---

[9] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).
[10] Id.
[11] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195/ (citing Rietschel RL, Fowler JF., Jr . Fisher's Contact Dermatitis. 5th ed. Philadelphia: Lippincott Williams & Wilkins; 2001).
[12] Tudela E, MacPherson C, Maibach HI. Long-term trend in patch test reactions: a 32-year statistical overview (1970-2002), part II. Cutan Ocul Toxicol. 2008;27(3):187-202. doi: 10.1080/15569520802143436. PMID: 18988088.
[13] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).
[14] Id.

DMDM hydantoin is a safe cosmetic ingredient, "data suggest that an increase in the use of this preservative may also increase the risk of cosmetic dermatitis in patients allergic to formaldehyde."[15] The authors further suggest that cosmetic products with FRPs should have warnings that the products "'contain formaldehyde'… whether present as free formaldehyde or bound by a donor."[16]

47.     Several more recent studies, including a 2015 study "determined that longer storage time and higher temperature increase the amount of formaldehyde released from FRPs and could ultimately lead to more severe health concerns."[17]

48.     In other words, "reactions that generated formaldehyde occur silently as the products sit on shelves in stores or bathroom cabinets."[18]

49.     Formaldehyde is a known human carcinogen and is recognized as such by the United States National Toxicology Program and the International Agency for Research on Cancer.[19]

50.     In 2009, prior to the sale of the Products, "a review of the literature on occupational exposures and formaldehyde shows a link between formaldehyde and leukemia."[20]

---

[15] *Id.*

[16] *Id.*

[17] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (last accessed June 7, 2021). (citing Lv, C., Hou, J., Xie, W., & Cheng, H. (2015). Investigation on formaldehyde release from preservatives in cosmetics. International journal of cosmetic science.).

[18] https://www.ewg.org/research/exposing-cosmetics-cover-up#formaldehyde (last accessed June 7, 2021).

[19] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (last accessed June 7, 2021) (citing International Agency for Research on Cancer. "IARC classifies formaldehyde as carcinogenic to humans." Press release. June 15, 2004. Accessed January 9, 2009.).

[20] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (last accessed June 7, 2021) (Zhang et al 2009. Meta-analysis of formaldehyde and hematologic cancers in humans. Mutation Research 681: 150-168).

51.    In June 2011, the National Toxicology Program, an interagency program of the Department of Health and Human Services, named formaldehyde as a known human carcinogen in its *12th Report on Carcinogens.*[21]

52.    With specific regard to FRPs, like DMDM hydantoin, "the formaldehyde released from FRPs has been linked to cancer, but there is little evidence that FRPs directly cause cancer. However, a mixture of the FRP bromopol and amines, which form nitrosamines, has been found to penetrate skin and cause cancer."[22]

53.    Further, a study in 2010 concluded that although "[i]t has been long accepted that formaldehyde-releaser sensitization is attributable to released formaldehyde. However, clinical studies show the existence of patients allergic to formaldehyde-releasers but not to formaldehyde itself."[23] That same study found DMDM hydantoin to be "reactive per se."

54.    Consequently, it is unsurprising that DMDM hydantoin is considered by the U.S. Food & Drug Administration as one of the top allergens "that cause the most allergic reactions from the use of cosmetic products."[24]

55.    Specifically, DMDM hydantoin can "trigger the immune system to release chemical substances such as antibodies," resulting in reactions such as itchiness, red rashes on

---

[21] "12th Report on Carcinogens." Society of Environmental Journalists. https://www.sej.org/library/health/12th-report-carcinogens (last accessed on June 7, 2021).
[22] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed June 7, 2021) (citing to http://www.cosmeticsinfo.org/nitrosamines. Accessed September 23, 2015).
[23] Kireche M, Gimenez-Arnau E, Lepoittevin JP. Preservatives in cosmetics: reactivity of allergenic formaldehyde-releasers towards amino acids through breakdown products other than formaldehyde. Contact Dermatitis. 2010 Oct;63(4):192-202. doi: 10.1111/j.1600-0536.2010.01770.x. Epub 2010 Aug 20. PMID: 20731691.
[24] https://www.fda.gov//cosmetics/cosmetics-ingredients/allergens-cosmetics (last accessed June 7, 2021).

the skin, or more extreme reactions.[25]

56.     Further, as a person becomes more exposed to an irritant over time, including DMDM hydantoin, the likelihood and severity of the reaction increase. This is called irritant contact dermatitis ("ICD"), which "can occur in any person if the amount and duration of irritant exposure are sufficient to cause direct epidermal keratinocyte damage."[26]

57.     Likewise, the irritation of the scalp, including dermatitis, has been linked to hair brittleness and hair loss. Specifically,

> [A number of observations have found that premature hair loss may be caused by the poor scalp health associated with either dandruff and seborrheic dermatitis, or psoriasis, indicating that the effect on the preemergent hair fiber may alter the anchoring force of the fiber with the follicle, as evidenced by an increased proportion both of catagen and telogen, and of dysplastic anagen hairs (anagen hairs devoid of hair root sheaths) in the trichogram (hair pluck).[27]

58.     In 2012, following formaldehyde being identified as a carcinogen by the National Toxicology Program, Johnson & Johnson announced that it would "remove a host of potentially harmful chemicals, *like formaldehyde*, from its line of consumer products by the end of 2015."[28] [Emphasis Added].

59.     Like many other beauty manufacturers, Johnson & Johnson has been using DMDM hydantoin as a preservative in its products since before 2011; and like many manufacturers moved away from toxic ingredients, including DMDM hydantoin, starting in 2012. However, Johnson & Johnson continues to use this formaldehyde donor today in various

---

[25] *Id.*

[26] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195/

[27] Trueb, Ralph M., Henry, Jim P., Davis, Mike G., and Schwartz, Jim R., Scalp Condition Impacts Hair Growth and Retention via Oxidative Stress, Int J Trichology. 2018 Nov-Dec; 10(6): 262–270, doi: 10.4103/ijt.ijt_57_18.

[28] https://www.nytimes.com/2012/08/16/business/johnson-johnson-to-remove-formaldehyde-from-products.html

OGX branded products.

60.     Notably, despite continuing to use FRPs in its some adult products, Johnson & Johnson proudly announced to the public that FRPs, like DMDM hydantoin, were not used in baby care products.[29]

61.     As Johnson & Johnson is aware, there is a litany of alternative preservatives that can be used in shampoos and cosmetics that do not release known human carcinogens and are non-synthetic, including:

        a.   Glyoxylic acid (or derivatives thereof);

        b.   Potassium sorbate and sorbic acid;

        c.   Citric acid and its salts;

        d.   Rosemary oil extract;

        e.   Neem oil extract;

        f.   Lavender oil;

        g.   Grapefruit seed extract;

        h.   Vinegars; and

        i.   Others.

62.     In addition to these alternatives, Johnson & Johnson also could have used lower levels of DMDM hydantoin; however, the risk of development and exacerbation of sensitivity or allergic reaction would still exist through repeated and prolonged use.

63.     Upon information and belief, Johnson & Johnson uses alternative preservatives in other OGX products and, in fact, uses alternative preservatives in these exact OGX Products

---

[29] https://www.businesstoday.in/current/corporate/our-baby-shampoo-does-not-contain-formaldehyde-johnson--johnson/story/354855.html (last accessed June 7, 2021).

that are sold in other countries.

**C. Johnson & Johnson's Misrepresentations Regarding the OGX Products.**

64.     Johnson & Johnson took over production and manufacturing of the OGX Products in 2016.  The Products were sold by Johnson & Johnson directly and through retail shops to consumers nationwide, including in Illinois.

65.     The OGX Products state, on the front of the bottles' labels, that the Products are formulated with various oils, fruits, and botanicals that are intended to nourish and revive damage or dry hair, add softness and shine, and prevent frizzing and tangling; and that the OGX Products "deeply nourish," "gently cleanse," and "repair hair."

66.     Plaintiff and the Class did not and would not expect that application of the Products would or could cause hair loss and scalp irritation upon proper application.

67.     Plaintiff and the Class reasonably expected a warning regarding any potential hazard to consumers, especially because the Food, Drug and Cosmetic Act regulations provide that cosmetics that may be hazardous to consumers must bear appropriate warnings.[30]

68.     The Food and Drug Administration has written about the risks of formaldehyde and formaldehyde donors (like DMDM Hydantoin) in hair care and actively discourages home purchase of hair smoothing products such as Defendant's Products.[31]

69.     Johnson & Johnson continues to this day to advise consumers that these Products are safe to use as directed, without providing any disclosure concerning the complaints of hair loss and with no warnings regarding the hair loss that may result from their continued use.

---

[30] *See* https://www.fda.gov/cosmetics/cosmetics-labeling/cosmetics-labeling-regulations
[31] https://www.fda.gov/consumers/consumer-updates/formaldehyde-hair-smoothing-products-what-you-should-know?utm_medium=email&utm_source=govdelivery (last accessed June 7, 2021).

Indeed, despite Johnson & Johnson's knowledge and awareness of hundreds if not thousands of online complaints of significant hair loss and breakage caused by the Products, Johnson & Johnson continues to sell the Products without providing consumers with ***any*** revised warnings or disclosures.

70.     The Products are marketed and sold at retail stores such as CVS, Target, Walgreens, Ulta, and Walmart, and through e-commerce websites such as Amazon.com, CVS.com, Target.com, Walgreens.com, Ulta.com, and Walmart.com.

71.     Defendant manufactures, advertises, markets, distributes and sells the Products in several sizes throughout the United States, including in Illinois.

**D. Defendant's False and Deceptive Advertising and Labeling of the Products.**

72.     In violation of 21 U.S.C. § 362(a) and 21 C.F.R. § 701.1(b), Defendant has consistently, falsely and deceptively advertised and labeled the Products in an effort to make consumers believe that the Products' ingredients, including DMDM hydantoin, were safe for use.

73.     Since launching the Products, Defendant has consistently conveyed its uniform, deceptive message to consumers throughout the United States, including the state of Illinois, that the Products formulated with formaldehyde donors, including DMDM hydantoin, are safe for use.

74.     These uniform deceptive claims have been made and repeated across a variety of media including Defendant's Products' labels, websites and online promotional materials, and at the point-of-purchase, where they cannot be missed by consumers. In truth, Defendant's claims that DMDM hydantoin is a safe ingredient are false, misleading, and deceptive because the Products' ingredients, including DMDM hydantoin, were not safe, caused serious scalp

irritation and hair loss, and do not safely smooth, nourish, cleanse, and/or repair hair.

75.     Upon information and belief, Johnson & Johnson knowingly permitted the manufacture and sale of the Products that were dangerous and unfit for sale as temporary hair "smoothing" products.

76.     Prior to placing the Products into the stream of commerce for sale to Plaintiff and the putative Class, Defendant was aware or should have been aware that the Products contained one or more unsafe ingredients, including DMDM hydantoin, that could cause significant hair loss and scalp irritation upon proper application and that any instructions and warnings provided with the Products directly to consumers were materially insufficient.

77.     Defendant knew, or but for its reckless indifference would have known, prior to Plaintiff and the putative Class's purchases of the Products that it would continue to receive complaints of irritation, allergic reaction, and/or hair loss attributed to the Products.

78.     Defendant knew, or but for its reckless indifference would have known, that: (a) the risk of scalp irritation and hair loss was substantial, if not a certainty, (b) Johnson & Johnson's customers were unaware of that substantial risk, and (c) those customers had a reasonable expectation that Johnson & Johnson would not sell the Products under those conditions.

79.     Despite such knowledge, Defendant did not disclose to prospective purchasers, that there was a substantial risk of scalp irritation and hair loss associated with use of the Products. Defendant instead continued to claim that the Products' ingredients, including DMDM hydantoin, were safe.

80.     However, despite the representation that the Products "gently" cleanse, they contain one or more ingredients, including DMDM hydantoin, that is a known formaldehyde

donor that can cause scalp irritation and hair loss.

81.   Defendant reinforces the false and deceptive claims that the Products "nourish", "smooth", "revive", "soften" and leave hair in great condition through the websites of various authorized retailers and on its own product websites.

**E.  The Impact of Defendant's False, Misleading and Deceptive Advertising.**

82.   Defendant intended for consumers to rely upon the representations on the Products' labels, and reasonable consumers, including Plaintiff and the Class, did, in fact, so rely. These representations are often the only source of information consumers can use to make decisions concerning whether to buy and use such products.

83.   Consumers lack the ability to test or independently ascertain the genuineness of product claims of normal everyday consumer products, especially at the point-of-sale. Reasonable customers must therefore rely on consumer product companies, such as Defendant, to honestly represent their Products and the Products' attributes on the Products' labels.

84.   At all relevant times, Defendant directed the above-referenced Products' labels, statements, claims and innuendo – including that the Products gently smooth, clean, nourish, strengthen, revive, and repair the hair, that the ingredients were safe – to consumers in general and Plaintiff and all Class Members in particular, as evidenced by their eventual purchases of the Products.

85.   Plaintiff and Class Members did reasonably rely on Defendant's Product labels, statements, advertisements, claims and innuendo in deciding to purchase the Products and were thereby deceived.

86.   As a result of Defendant's deceptive labeling and/or marketing campaign, Defendant has caused Plaintiff and putative Class Members to purchase the Products, which

contained one or more unsafe ingredients, including DMDM hydantoin, and do not safely smooth, nourish, cleanse, and/or repair hair. Plaintiff and putative Class Members have been harmed, as they would not have purchased the Products had they known the Products were not safe and would or could cause scalp irritation and hair loss.

87.    As a result of Defendant's misconduct, Defendant was able to sell the Products to at least thousands of consumers throughout the United States— including Plaintiff and putative Class Members—and realized sizeable profits.

88.    Plaintiff and putative Class Members were harmed and suffered actual damages in that Plaintiff and putative Class Members did not receive the benefit of their bargain as purchasers of the Products, which were represented as safe and can safely smooth, nourish, cleanse, and/or repair hair. Indeed, Plaintiff and putative Class Members did not receive the benefit of their bargain after purchasing the Products, as Plaintiff and putative Class Members paid for Products that were unsafe, could cause scalp irritation and hair loss, and do not safely smooth, nourish, cleanse, and/or repair hair.

89.    Defendant developed and knowingly employed a labeling, advertising and/or marketing strategy designed to deceive consumers into believing that the Products contain safe ingredients and can safely smooth, nourish, cleanse, revive, and/or repair hair.

90.    The purpose of Defendant's scheme was to stimulate sales, engender public trust, and enhance Defendant's profits.

91.    As the manufacturers, marketers, advertisers, distributors and/or sellers of the OGX Products, Defendant possess specialized knowledge regarding the Products and the content of the ingredients contained therein. In other words, Defendant knew exactly what is – and is not – contained in the OGX Products, at what levels, and are safe or unsafe.

92.     Defendant knew or should have known, but failed to disclose, that the Products contain one or more unsafe ingredients, including DMDM hydantoin, and do not safely smooth, nourish, cleanse, revive, and/or repair hair, as labeled and/or marketed by Defendant.

93.     Plaintiff and putative Class Members were, in fact, misled by Defendant's labeling, representations and marketing of the Products.

94.     The unsafe ingredient(s) and the inability of the Products to safely smooth, nourish, cleanse, revive, and/or repair hair, leave consumers, such as Plaintiff and the putative Class with no reason to purchase these Products at all, since other proven and safer comparably priced products exist.

95.     The Products are defined as "cosmetics" under 21 U.S.C.S. § 321(i) of the Federal Food Drug & Cosmetic Act ("FDCA").

96.     Defendant's deceptive statements violate 21 U.S.C.S. § 362(a), which deems a cosmetic product misbranded when the label contains a statement that is "false or misleading in any particular."

97.     Also, the Illinois Consumer Fraud and Deceptive Business Practices Act protects Defendant's consumers, and provides:

> § 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

98.     The FDA promulgated regulations for compliance with the FDCA at 21 C.F.R.

§§ 701 *et seq*. (for cosmetics).

99.  The introduction of misbranded cosmetics into interstate commerce is prohibited under the FDCA and all parallel state statutes cited in this Complaint.

100.  Plaintiff and putative Class Members would not have purchased the Products had they known the Products contained one or more unsafe ingredients and are incapable of safely smoothing, nourishing, cleansing, and/or repairing hair.

## PLAINTIFF'S FACTUAL ALLEGATIONS

101.  Plaintiff, Larissa Whipple, purchased the Products during the class period in Davis, Illinois. Before purchasing the Products, Plaintiff reviewed information about the Products on the Products' labels and the fact that the Products were being sold for personal use, and not resale. At the time of purchasing her Products, Plaintiff also reviewed the accompanying disclosures and marketing materials, and understood them as representations made by Defendant that the Products were safe to smooth, nourish, cleanse, and/or repair hair. Plaintiff relied on these representations and in deciding to purchase Defendant's Products. Accordingly, these representations were part of the basis of the bargain, in that she would not have purchased the Products had she known these representations were not true. Here, Plaintiff did not receive the benefit of her bargain because Defendant's Products are not safe to smooth, nourish, cleanse, and/or repair hair.

102.  Plaintiff purchased the Products because she wanted smooth, nourished, and healthy hair.

103.  Before using the Products, Plaintiff followed the instructions on the Products' labels, as directed by Defendant.

104.    Plaintiff reasonably expected that the Products she purchased would and could not cause scalp irritation or hair loss. Further, Plaintiff reasonably expected that if Johnson & Johnson, the company primarily responsible for developing, manufacturing, marketing and distributing the OGX Products, knew that the Products would or could cause hair loss, Johnson & Johnson would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem.

105.    As a result of Johnson & Johnson's concealment, misrepresentations and omissions, Plaintiff purchased the Products. Had Plaintiff known the true nature of the Products, she would not have purchased the Products.

## ESTOPPEL FROM PLEADING AND
## TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

106.    Plaintiff and members of the putative Classes are within the applicable statute of limitation for the claims presented here. Defendant had knowledge and information detailing the Products' propensity to cause or contribute to hair loss and/or scalp irritation, but failed to disclose this information to consumers. Plaintiff and members of the putative Classes, therefore, could not reasonably have known that the Products would cause or contribute to hair loss and scalp irritation. Rather, consumers relied upon Defendant's misrepresentations and omissions, including the statements on the Products' labeling as set forth above.

107.    Once Plaintiff incurred damages, she promptly acted to preserve her rights, filing this action. Defendant is estopped from asserting any statute of limitation defense that might otherwise be applicable to the claims asserted herein.

## CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this action on behalf of herself and the following Classes pursuant

to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **National Class**: All persons in the United States who purchased the Products.
>
> **Consumer Fraud Multi-State Class**: All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Products.[32]
>
> **Illinois Sub-Class**: All persons in the State of Illinois who purchased the Products.

109.    Excluded from the Classes are (a) any person who purchased the Products for resale and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

110.    Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

111.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable.

---

[32] The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, et seq., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce within the State of Illinois. The States in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case as alleged herein: California (Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. § 501.201 et seq.); Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A et seq.); Michigan (Mich. Comp. Laws § 445.901 et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010 et seq.); New Hampshire (N.H. Rev. Stat. § 358-A:1); New York, (N.Y. Gen Bus. Law Secs. 349 and 350); New Jersey (N.J. Stat. § 56:9-1, et seq.); Rhode Island (R.I. Gen. L. Ch. 6-13.1); Washington (Wash. Rev. Code § 19.86010, et seq.) and Wisconsin (WIS. STAT. § 100.18, et seq.).

While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class Members. Moreover, the number of members of the Classes may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by mail and/or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

112. **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are limited to, the following:

a. Whether the Products contain the defect alleged herein;

b. Whether Defendant failed to appropriately warn Class Members of the damage that could result from use of the Products;

c. Whether Defendant had actual or imputed knowledge of the defect but did not disclose it to Plaintiff and the Classes;

d. Whether Defendant promoted the Products with false and misleading statements of fact and material omissions;

e. Whether Defendant's marketing, advertising, packaging, labeling, and/or other promotional materials for the Products are deceptive, unfair or misleading;

f. Whether Defendant's actions violate the state consumer fraud statutes invoked below;

g. Whether Defendant's actions and omissions violate Illinois law;

h. Whether Defendant's conduct violates public policy;

i. Whether Defendant's acts, omissions or misrepresentations of material facts constitute fraud;

j. Whether Plaintiff and putative members of the Classes have suffered an

ascertainable loss of monies or property or other value as a result of Defendant's acts, omissions or misrepresentations of material facts;

k.  Whether Defendant was unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Products;

l.  Whether Plaintiff and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

m. Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory or injunctive relief and, if so, the nature of such relief.

113.    Pursuant to Rule 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to the putative Classes, thereby making final injunctive or corresponding declaratory relief appropriate with respect to the putative Classes as a whole. In particular, Defendant has manufactured, marketed, advertised, distributed and sold Products that are deceptively misrepresented as being able to safely smooth, nourish, cleanse, and/or repair hair.

114.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the absent Class Members in that Plaintiff and the Class Members each purchased and used the Products and each sustained damages arising from Defendant's wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by Defendant's common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendant's deceptive misrepresentations regarding the ability of the Products to safely smooth, nourish, cleanse, and/or repair hair, as alleged herein.

115.    **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiff

has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

116. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. Accordingly, the proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

117. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and all Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

118. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

  a. The damages suffered by each individual members of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct;

  b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which

the individual litigation would proceed;

c.   The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d.   Individual joinder of all members of the Classes is impracticable;

e.   Absent a Class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of Defendant's unlawful conduct; and

f.   This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by Defendant.

119.   In the alternative, the Classes may be certified for the following reasons:

a.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant;

b.   Adjudications of claims of the individual members of the Classes against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests; and

c.   Defendant has acted or refused to act on grounds generally applicable to the members of the putative Classes, thereby making appropriate final and injunctive relief with respect to the putative Classes as a whole.

## **CLAIMS FOR RELIEF**

## **COUNT I**
**Violation Of State Consumer Fraud Acts**
**(On Behalf Of The Multi-State Class)**

120.   Plaintiff repeats and re-alleges all proceeding factual allegations above as if fully set forth herein.

121.   The Consumer Fraud Acts of the States in the Multi-State Class[33] prohibit the

---

[33] The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, et seq., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce within the State of

use of unfair or deceptive business practices in the conduct of trade or commerce.

122.    Defendant intended that Plaintiff and each of the other members of the Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

123.    Had the truth been known, Plaintiff and other Multi-State Class Members would not have purchased Defendant's Products, or would not have paid as much for the Products.

124.    As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Multi-State Class have sustained damages in an amount to be proven at trial.

125.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II
### Violation of the Illinois Consumer Fraud Act
### (On Behalf of the Illinois Sub-Class, in the alternative to Count I)

126.    Plaintiff repeats and realleges all proceeding factual allegations above as if fully set forth herein.

127.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq*., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

128.    Plaintiff and other members of the Illinois Sub-Class, as purchasers of the Products, are consumers within the meaning of the ICFA given that Defendant's business

---

Illinois. The States in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case as alleged herein: California (Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. § 501.201 et seq.); Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A et seq.); Michigan (Mich. Comp. Laws § 445.901 et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010 et seq.); New Hampshire (N.H. Rev. Stat. § 358-A:1); New York, (N.Y. Gen Bus. Law Secs. 349 and 350); New Jersey (N.J. Stat. § 56:9-1, et seq.); Rhode Island (R.I. Gen. L. Ch. 6-13.1); Washington (Wash. Rev. Code § 19.86010, et seq.) and Wisconsin (WIS. STAT. § 100.18, et seq.).

activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

129.   Defendant's conduct in misrepresenting the benefits of its Products constitute the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendant's trade or commerce.

130.   Defendant also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiff and other members of the Illinois Sub-Class knowing that consumers would rely on the advertisements and packaging and Defendant's uniform representations to purchase the Products.

131.   Once the defect in the Products and its tendency to cause hair loss and/or scalp irritation despite proper application (or based upon foreseeable misapplication) became apparent to Defendant, consumers (Plaintiff and other members of the putative Illinois Sub-Class) were entitled to disclosure of that fact because a significant risk of hair loss and/or scalp irritation would be a material fact in a consumer's decision-making process, and, without Defendant's disclosure consumers would not necessarily know that there is such a risk.

132.   Defendant intended that Plaintiff and the Illinois Sub-Class would rely on the continued deception by purchasing the Products, unaware of the material facts and omissions described above. Defendant knew that its customers would continue to rely on its representations that the Products were safe when used as directed, and knew that consumers would continue to rely upon its silence as to any known risk of hair loss and/or scalp irritation as evidence that the Products were safe. This conduct constitutes consumer fraud within the meaning of the ICFA.

133.   Defendant's material non-disclosure set forth above constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or

omission of material facts as to the nature of the goods, in violation of the ICFA.

134.    Plaintiff and the other members of the Illinois Sub-Class suffered damages as a proximate result of the unfair acts or practices of Defendant alleged herein. Defendant's misrepresentations and/or omissions of material fact were done knowingly, intentionally, willfully or with reckless disregard for the consequences of its actions.

135.    Plaintiff and other members of the Illinois Sub-Class would not have purchased the Products but for the promised benefits and concealment of any risk of harm because the Products as sold had no intrinsic value to them

136.    Defendant knowingly accepted the benefits of its deception and improper conduct in the form of profits from the increased sale of the Products.

137.    As a proximate result of the above-described violations of the ICFA, Plaintiff and other members of the Illinois Sub-Class: (a) purchased and used the Products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchasing the Products; and (c) suffered and/or will suffer additional economic losses in repairing and restoring the damage caused by the Products.

138.    Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

139.    Plaintiff also seeks to enjoin Defendant's ongoing deceptive practices relating to their claims on the Products' labels and advertising.


## COUNT III
### Violation of the Illinois Uniform Deceptive Trade Practice Act
### ILCS §§ 510/2, et seq.
### (On Behalf of the Illinois Sub-Class, in the alternative to Count I)

140.    Plaintiff repeats and realleges all proceeding factual allegations above as if fully

set forth herein.

141.   Plaintiff brings this claim on behalf of herself and the Illinois Sub-Class for violations of the Illinois Uniform Deceptive Trade Practices Act, ILCS §§ 510/2, et seq.

142.   Defendant constitutes a "person" as defined by 815 ILCS §§ 510/1(5).

143.   Defendant engaged in deceptive trade practices in the conduct of their business, in violation of 815 ILCS §§ 510/2(a), including:

a.   Defendant represented to Plaintiff and the Class that the Products had approval or characteristics that it did not have;

b.   Defendant represented to Plaintiff and the Class that the Products were of a particular standard, quality, or grade when they were actually of another;

c.   Defendant advertised to Plaintiff and the Class goods with intent not to sell them as advertised;

d.   Defendant engaged in other fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding; and

e.   Defendant represented that consumers' purchases of the Products conferred or involved rights that the transactions did not have or involve.

144.   As described herein, Defendant repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products were hair "smoothing" Products and that the Products were safe to smooth, nourish, cleanse or repair hair.

145.   Contrary to these representations, the Products are not appropriate hair "smoothing" products and are not capable of safely smoothing, nourishing, cleansing, or repairing hair as described on the Product labels or in Defendant's uniform marketing and

advertising campaign. Rather, the Products are defective because their inclusion of DMDM hydantoin gives the Products the propensity to cause, and have caused, adverse reactions, such as hair loss, scalp redness, and scalp irritation, rendering the Products unsafe and unsuitable for consumer use as marketed by Defendant.

146. Defendant had exclusive knowledge of material facts concerning the defective nature of the Products, including that they had the propensity to cause, and had caused these adverse reactions.

147. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

148. The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Illinois Sub-Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

149. As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and Illinois Sub-Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing Defendant's Products, and increased time and expense in treating damages caused by the Products.

150. Plaintiff and Illinois Sub-Class members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

## COUNT IV
### Fraud
### (On Behalf of the Nationwide and/or
### Illinois Sub-Class)

151. Plaintiff repeats and realleges all proceeding factual allegations above as if fully

set forth herein.

152.    Plaintiff brings this cause of action on behalf of herself, the Nationwide Class and/or the Illinois Sub-Class against Defendant.

153.    As alleged herein, Defendant, Johnson & Johnson, knowingly made material misrepresentations and omissions regarding the Products on the Products' labeling and packaging in the Products' advertisements, and/or on its website.

154.    Defendant made these material misrepresentations and omissions in order to induce Plaintiff and putative Class Members to purchase the Products.

155.    Rather than inform consumers that the Products contained a defect that caused hair loss upon proper application and did not otherwise perform as represented and for the particular purpose for which it was intended, Defendant claims in marketing materials and its marketing campaign for the Products that the Products will "smooth," "deeply nourish," "gently cleanse," and "repair hair," in order to mislead consumers that the Products have the ability to safely smooth, nourish, cleanse, and/or repair hair.

156.    The inclusion of the defect that causes hair loss and/or scalp irritation upon proper application renders the Products unable to safely smooth, nourish, cleanse, and repair hair.

157.    Defendant knew the Products were incapable of safely smoothing, nourishing, cleansing, and/or repairing hair, but nevertheless made such representations through the marketing, advertising and on the Products' labeling. In reliance on these and other similar misrepresentations, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Products.

158.    Had Plaintiff and the Class known the truth about the Products, they would not

44

have purchased the Products.

159.     As a proximate result of the fraudulent conduct of Defendant, Plaintiff and the putative Class paid monies to Defendant, through their regular retail sales channels, to which Defendant are not entitled, and have been damaged in an amount to be proven at trial.

## COUNT V
### Unjust Enrichment
### (On Behalf of the Nationwide and/or
### Illinois Sub-Class)

160.     Plaintiff repeats and realleges all proceeding factual allegations above as if fully set forth herein.

161.     Plaintiff brings this cause of action on behalf of herself, and the putative Classes against Defendant.

162.     Plaintiff and putative Class Members conferred a benefit on Defendant when they purchased the Products, of which Defendant had knowledge. By its wrongful acts and omissions described herein, including selling the Products, which contain a defect that caused hair loss upon proper application and did not otherwise perform as represented and for the particular purpose for which they were intended, Defendant was unjustly enriched at the expense of Plaintiff and putative Class Members.

163.     Plaintiff's detriment and Defendant's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

164.     Defendant has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and putative Class Members under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit. It would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the Products.

165.    Defendant has been unjustly enriched in retaining the revenues derived from Class Members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant manufactured defective Products, and Johnson & Johnson misrepresented the nature of the Products, misrepresented their ingredients, and knowingly marketed and promoted dangerous and defective Products, which caused injuries to Plaintiff and the Class because they would not have purchased the Products based on the same representations if the true facts concerning the Products had been known.

166.    Plaintiff and putative Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased the Products on the same terms or for the same price had they known the true nature of the Products and the mis-statements regarding what the Products were and what they contained.

167.    Defendant either knew or should have known that payments rendered by Plaintiff and putative Class Members were given and received with the expectation that the Products were able to safely nourish, cleanse, and repair hair as represented by Defendant in advertising, on Defendant's websites, and on the Products' labels and packaging. It is inequitable for Defendant to retain the benefit of payments under these circumstances.

168.    Plaintiff and putative Class Members are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant.

169.    When required, Plaintiff and Class Members are in privity with Defendant because Defendant's sale of the Products was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendant's agents for the purpose of the sale of the Products.

170.    As a direct and proximate result of Defendant's wrongful conduct and unjust

enrichment, Plaintiff and putative Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for their inequitable and unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A. Declaring that this action is properly maintained as a class action, certifying the proposed Class(es), appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B. Directing that Defendant bear the costs of any notice sent to the Class(es);

C. Declaring that Defendant must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Products, or order Defendant to make full restitution to Plaintiff and the members of the Class(es);

D. Awarding restitution and other appropriate equitable relief;

E. Granting an injunction against Johnson & Johnson to enjoin it from conducting its business through the unlawful, unfair and fraudulent acts or practices set forth herein;

F. Granting an Order requiring Johnson & Johnson to fully and appropriately recall the Products, to remove the claims on its website and elsewhere that the Products are safe to use, and to fully and properly disclose the safety risks associated with the Products to anyone who may still be at risk of buying and using the Products;

G. Ordering a jury trial and damages according to proof;

H. Awarding Plaintiff and members of the Class(es) statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I. Enjoining Defendant from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J. Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

K. Awarding civil penalties, prejudgment interest and punitive damages as permitted by law; and

L. Ordering such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: June 25, 2021     Respectfully submitted,

           **SHUB LAW FIRM LLC**

           */s/ Jonathan Shub*
           Jonathan Shub
           Kevin Laukaitis
           134 Kings Highway E, 2nd Floor
           Haddonfield, NJ 08033
           T: 856-772-7200
           F: 856-210-9088
           jshub@shublawyers.com
           klaukaitis@shublawyers.com

           Andrew J. Sciolla*
           **SCIOLLA LAW FIRM LLC**
           Land Title Building 1910
           100 S. Broad Street
           Philadelphia, PA 19110
           T: 267-328-5245
           F: 215-972-1545
           andrew@sciollalawfirm.com

           Daniel K. Bryson*
           Harper T. Segui*
           Caroline Ramsey Taylor*
           **WHITFIELD BRYSON, LLP**
           900 W. Morgan Street
           Raleigh, NC 27603
           T: 919-600-5000
           dan@whitfieldbryson.com
           harper@whitfieldbryson.com
           caroline@whitfieldbryson.com

           *Pro Hac Vice* Application Forthcoming

           *Attorneys for Plaintiff and Putative Class Members*

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan Shub, hereby certify this 25th day of June, 2021, the foregoing First Amended Class Action Complaint was filed via the Court's electronic filing system and will be electronically sent to all counsel of record.

*/s/ Jonathan Shub*
Jonathan Shub
